IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA OLIVER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 6:21-cv-03226-MDH |
| ) | |
| CORIZON LLC., et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the Court is Defendant Chada's Motion for Summary Judgment. (Doc. 257). The motion has been fully briefed and is ripe for review. Plaintiff brings the following claims against Defendant: Count I – Deprivation of Medical Care in Violation of the 8th and 14th Amendments under 42 U.S.C. § 1983; and Count V – Wrongful Death via Medical Malpractice/Negligence. Defendant Chada moves for summary judgment on both counts.

## BACKGROUND

This case arises out of the death of Michael Anderson who was incarcerated at South Central Correctional Center ("SCCC") in Licking, Missouri. Anderson arrived at SCCC on or about January 21, 2020. He had previously been confined at Fulton Reception and Diagnostic Center from October 24, 2019 to January 21, 2020. Anderson remained at SCCC until February 6, 2020, when he was transported to Texas County Memorial Hospital, in Houston, Missouri. Anderson died on February 6, 2020.

Defendant Ashok Kumar Chada, M.D. has been a medical doctor for approximately 47 years. Dr. Chada was employed as the medical director at SCCC by Corizon, LLC. In January and

1

February 2020, Corizon was under contract with the State of Missouri to provide medical care and treatment to offenders incarcerated within MDOC.

When Anderson arrived at SCCC he had already been tested and diagnosed with tuberculosis. Anderson had also reported he had asthma and used an inhaler. On or about January 27, 2020, Dr. Chada ordered that Anderson's prescription for an albuterol nebulizer be renewed.

Anderson was seen by nurse Hartman in the chronic care clinic on February 4, 2020. At 8:30 a.m. on February 5, 2020, Anderson self-declared a medical emergency and presented to the Medical Unit. He complained he could not breath, he was coughing up blood, and he had chest pain. Anderson was seen by nurse Murr who noted his complaints.

Murr examined Anderson and noted the following vital signs: blood pressure, 112/68; pulse, 94; respirations, 22; temperature, 97.8; and oxygen saturation level (on room air), 86 percent, after nebulizer treatment. Because of Anderson's complaints and history of tuberculosis, Murr had Anderson provide sputum by spitting in a sterile specimen cup to assess it. She noticed that the sputum had red streaks in it and appeared to be bloody. She completed a TB Isolation Needs Worksheet ("tuberculosis worksheet") and conferred with Dr. Chada and nurse Hartman about her findings and assessment.

Dr. Chada issued orders to admit Anderson to the infirmary, obtain a chest x-ray, obtain an AFB sputum sample, conduct a PPD tuberculosis skin test, and contact a provider if his temperature was over 100.4 degrees. Dr. Chada further ordered that if Anderson's temperature was over 100.4 degrees two blood cultures should be obtained and two additional sputum samples. Plaintiff disputes some of the details of the orders issued by Dr. Chada, including whether Dr. Chada issued them and the timing of the orders.

Anderson was admitted to the infirmary around 9:15 a.m on February 5, 2020. Nurse Stephan was working the dayshift as the infirmary nurse when Anderson was admitted. Anderson was placed in a respiratory isolation room. Dr. Chada prescribed 750 mg levofloxacin, an antibiotic, and saw Anderson at around 11:30 a.m. Anderson told Dr. Chada he was coughing up blood. During his examination of Anderson on February 5, 2020, Dr. Chada did not detect any signs or symptoms of sepsis.

Stephan was working the dayshift, from 7:00 a.m. to 3:00 p.m., as the infirmary nurse when Anderson was admitted. Stephan went off her shift at approximately 3:00 p.m., February 5, 2020 and gave her report to the oncoming nurse, Duncan. Duncan worked as an infirmary nurse during the evening shift, from 3:00 p.m. to 10:00 p.m., on February 5, 2022. Duncan provided medical care and treatment to Anderson during the evening shift on February 5, 2020. Neither Anderson nor anyone else told Duncan that he had been coughing up blood since February 3, 2020. At approximately 5:00 p.m., February 5, 2020, Duncan noted that Anderson's vitals signs were as follows: blood pressure, 120/82; pulse, 92; respirations, 16; temperature, 99.0; and oxygen saturation level, 92 percent on room air. Plaintiff disputes some of the entries made in the medical record. Anderson did not exhibit any signs or symptoms of fatigue or malaise to Duncan. At approximately 8:45 p.m., Duncan noted that Anderson's temperature was 101.2 and his oxygen saturation level was 84 to 87 percent on room air. Duncan placed Anderson's nasal canula back on him, at two liters; provided Anderson with over-the-counter pain medication; administered nebulizer treatment to Anderson; collected a second sputum sample from Anderson at approximately 10:00 p.m., February 5, 2020; collected two blood cultures, which were incorrectly entered as blood gases, from Anderson at 10:00 p.m. February 5, 2020; and called and gave her assessment of Anderson to the on-call physician, Dr.Sandra Zakroff, at approximately 10:00 p.m.

3

At approximately 10:00 p.m., February 5, 2020, Dr. Zakroff ordered that: oxygen be increased to four liters titrate to maintain 92 percent oxygen or above; and Anderson be given Rocephin, an antibiotic, every 12 hours. Again Plaintiff disputes some of the medical record entries. The first dose of Rocephin was administered at approximately 10:00 p.m., February 5, 2020. Duncan's shift ended at 10:00 p.m., and Stacy Rodgers, R.N. and Trish O'Neal, R.N. assumed care of Anderson.

Nurse Rodgers worked the 10:00 p.m. to 7:00 a.m. shift on February 5 to 6. Nurse Stephan worked the 7:00 a.m. to 3:00 p.m. dayshift in the infirmary on February 6, 2020. Nurse Hensel provided medical care and treatment to Anderson during the evening shift on February 6, 2020. Duncan worked the evening shift on February 6, 2020 and states she was not assigned to Anderson during that shift.

At approximately 10:30 a.m., February 6, 2020, Kent McNutt, D.O., a radiologist at Mid-Missouri Medical, called SCCC and informed Dr. Chada that the results of the chest x-ray ordered on February 5, 2020 indicated Anderson had pneumonia. At approximately 10:30 a.m. February 6, 2020, Stephan administered a second dose of Rocephin to Anderson. Once pneumonia was confirmed, Dr. Chada prescribed Levaquin, an antibiotic, in addition to Rocephin.

Dr. Chada saw Anderson at or about 11:20 a.m., February 6, 2020, and noted that: his lung sounds indicated mild crackling on the right upper chest and bilateral air entry; he had a mildly febrile temperature of 100.4 degrees; he was in no acute distress and was fair and stable; and he had no signs or symptoms of fatigue or malaise. Plaintiff disputes the medical records.

When Hensel assumed her shift, Anderson did not complain about shortness of breath. It was not until later during her shift that Anderson complained about shortness of breath. At approximately 4:00 p.m. during her shift, Hensel noticed Anderson had not eaten from his food

4

tray, and told her that he did not eat anything because he was nauseated from the antibiotics. At approximately 7:45 p.m. during her shift, Hensel was walking past Anderson's cell when he knocked on the window and signaled to her that he could not breathe.

Hensel entered Anderson's cell and saw that Anderson was having difficulty breathing and that his vital signs were not within the normal range, including respirations of 32 and an oxygen saturation level of 73 percent. Hensel attempted but was unable to elevate Anderson's oxygen saturation level and lower his respirations.

At approximately 7:55 p.m., Hensel called the on-call physician, Dr. Zakroff. Dr. Zakroff ordered that Anderson be sent out by ambulance to Texas County Memorial Hospital. Hensel then notified SCCC's shift captain and told him that Anderson was in respiratory distress and needed an ambulance. Hensel called and a gave a report on Anderson to a nurse at Texas County Memorial Hospital. The ambulance arrived at SCCC at approximately 8:15 p.m. When the ambulance arrived at SCCC Hensel gave a report to the paramedic.

Anderson was placed on a stretcher and left the infirmary at approximately 8:20 p.m. While Anderson was in the ambulance and onsite at SCCC, Anderson coded and the paramedic began performing CPR. While at Texas County Memorial, Anderson expired and was pronounced dead at 9:21 p.m., February 6, 2020. Plaintiff disputes the accuracy of the records and times.

Plaintiff has endorsed Michael T. Puerini, M.D. a correctional physician specialist. Dr. Puerini opines that "based on the chart documentation, Anderson required hospital care from the morning hours of February 5, 2020. At that point in the course of his severe acute illness, his life would have been saved had Dr. Chada simply chosen to hospitalize his acutely ill patient." Dr. Puerini opines that Anderson's death was clearly preventable.

5

Dr. Puerini opines that Dr. Chada violated the standard of care, in part, by failing to send Anderson to the hospital on February 5, 2020 because Anderson was in respiratory failure with an oxygen level of 86 percent and on February 6, 2020 because Anderson had an oxygen saturation level of 88 percent with life-threatening pneumonia. Dr. Puerini opines on several violations of the standard of care in his expert report and testimony.

Plaintiff has also endorsed Thomas M. Hyers, M.D. a practicing pulmonologist who is experienced in the diagnosis and treatment of respiratory infections. Dr. Hyers also opines that Dr. Chada deviated from the standard of care.

## STANDARD OF REVIEW

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party is entitled to summary judgment as a matter of law if they can establish there is "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Once the moving party has established a properly supported motion for summary judgment, the non-moving party cannot rest on allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 248.

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Id.* at 248-249.

## DISCUSSION

**1. Count I – Section 1983 – Deliberate Indifference**

In actions by prison inmates against prison officials for deliberate indifference under 42 U.S.C. Section 1983, it must be proven that: plaintiff suffered from objectively serious medical needs; the defendant(s) knew of the condition; and the defendant deliberately disregarded the complaint. *Kitchen v. Miller,* 343 F. Supp. 2d 820, 823, (E.D. Mo. 2004); and *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).

To support a claim of deliberate indifference under 42 U.S.C. Section 1983, "a prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir. 1995). A medical decision not to order a particular course of treatment or testing does not represent cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 107 (1976). Displeasure with a course of medical treatment is not sufficient to rise to a constitutional violation and prisoners do not have a constitutional right to any particular type of treatment. *Kitchen v. Miller*, 343 F.Supp. 2d at 823 and *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

Prison doctors may exercise their independent medical judgment, and failure or refusal to follow the recommendation of outside consultants does not automatically amount to an abuse of that judgment. *Dulany v. Carnahan*, 132 F.3d 1234, 1239-40 (8th Cir. 1997). Medical professionals may be absolved of liability if they responded reasonably to an inmate's medical needs, even if harm was not ultimately averted. *Id.* An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish

the detrimental effect of delay in medical treatment to succeed. *Crowley v. Hedgepeth,* 109 F.3d 500, 502 (8th Cir. 1997).

Plaintiff alleges on February 5th Anderson was suffering from a serious medical need that required transfer out of the infirmary and Dr. Chada was aware of this but failed to transfer him. Plaintiff argues a young healthy person with severe hypoxia and known pneumonia needs to be hospitalized. Plaintiff contends Dr. Chada chose not to hospitalize Anderson, and as supported by their experts' opinions, this violated a standard of care and resulted in the death of Anderson. Plaintiff's experts further opine Anderson's death was "clearly preventable" and he more likely than not would have survived and recovered completely. Plaintiff has provided expert opinions that create a genuine issue of material fact regarding the treatment of Anderson.

The Court makes no ruling on whether Plaintiff can ultimately prevail and support a claim of deliberate indifference under 42 U.S.C. Section 1983. However, Plaintiff has presented enough evidence in the summary judgment briefing, and in the expert reports, to create a factual dispute to survive summary judgment. Defendant's motion for summary judgment on Plaintiff's Section 1983 claim is denied.

**2. Count V - Wrongful Death via Medical Malpractice/Negligence**

To make a submissible case of negligent medical treatment, plaintiff must establish: 1) an act or omission of defendant failed to meet the requisite medical standard of care, 2) the act or omission was performed negligently, and 3) there was a causal connection between the act or omission and plaintiff's injury. *Sheffler v. Arana,* 950 S.W.2d 259, 267 (Mo. App. W.D. 1997). Expert testimony is required to support claims of medical negligence. *Ladish v. Gordon,* 879 S.W.2d 623, 628 (Mo. App. W.D. 1994). In order for plaintiff to make a submissible medical malpractice claim against the provider, plaintiff must show that the defendant failed to use the

degree of skill and learning ordinarily used under the same or similar circumstances by members of the profession. *Huelskamp. v. Patients First Health Care, LLC*, 475 S.W.3d 162, 168 (Mo. App. E.D. 2014).

To survive summary judgment on the issue of causation in a wrongful death case, plaintiff must demonstrate that there is a genuine issue of material fact regarding whether the defendant's conduct was both the cause in fact and the proximate, or legal, cause of the death. *Sundermeyer v. SSM Regional Health Servs.,* 271 S.W.3d 552, 554 (Mo. banc. 2008). The cause in fact is determined by asking whether the plaintiff's injury would not have occurred "but for" defendant's conduct, and a defendant's conduct is also the proximate cause of the plaintiff's injury if the injury complained of was the natural and probable consequence of the defendant's conduct. *Guffey v. Integrated Health Servs. Of Kansas City at Alpine N.,* 1 S.W.3d 509, 518 (Mo. App. W.D. 1999).

Here, Plaintiff has offered expert testimony that Anderson's chart shows that he required hospital care from the morning hours of February 5, 2020 and that his life would have been saved had he been hospitalized. Dr. Chada was involved in Anderson's care during this time. Based on the record before the Court, the Court finds a genuine issue of material fact exists regarding the issues presented in Plaintiff's claim for medical negligence. Dr. Chada was the doctor overseeing Anderson's care. As a result, the role, if any, Dr. Chada's actions had on Anderson's death is a factual dispute for the jury. Based on the record before the Court, the Court finds a genuine issue of material fact exists regarding the issues presented in Plaintiff's claim for medical negligence. Defendant's motion for summary judgment on Plaintiff's Count V - Wrongful Death via Medical Malpractice/Negligence is denied.

## DECISION

Wherefore, for the reasons set forth herein, Defendant's motion for summary judgment is **DENIED.** (Doc. 257).

**IT IS SO ORDERED.**

DATED:  December 17, 2024

                                                     */s/ Douglas Harpool*
                                                    **DOUGLAS HARPOOL**
                                                    **UNITED STATES DISTRICT JUDGE**